IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 3, 2019

**STATE OF TENNESSEE v. QUINTON WILKINS**

**Appeal from the Criminal Court for Shelby County**
**No. 15-03753    Chris Craft, Judge**

———————————————

**No. W2019-00354-CCA-R3-CD**

———————————————

The Defendant, Quinton Wilkins, was convicted by a Shelby County Criminal Court jury of attempt to commit second degree murder, a Class B felony; employing a firearm during the commission of a dangerous felony, a Class C felony; two counts of aggravated assault, a Class C felony; and reckless endangerment, a Class A misdemeanor. *See* T.C.A. §§ 39-12-101 (2018) (criminal attempt), 39-13-210 (2018) (second degree murder), 39-17-1324 (2014) (subsequently amended) (firearms possession), 39-13-102 (2018) (aggravated assault), 39-13-103 (2018) (reckless endangerment). After the appropriate merger, the trial court sentenced the Defendant as a Range II, multiple offender to fifteen years for attempted second degree murder, seven years for the firearm conviction, and seven years for aggravated assault. The court ordered consecutive service, for an effective twenty-nine-year sentence. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions, (2) the trial court erred by limiting his cross-examination of a State's witness, and (3) the trial court erred by admitting evidence of the Defendant's demeanor. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Phyllis L. Aluko, District Public Defender; Barry W. Kuhn (on appeal), Katherine Oberembt (at trial), and Brett Werenski (at trial), Assistant District Public Defenders, for the appellant, Quinton Wilkins.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; Melanie Cox, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to a 2015 shooting involving Ryan Tchouros and Patrick Gonyaw, who were working as carpet cleaning technicians at the time. At the trial, Mr. Tchouros testified that he had been employed by America's Best Carpet and Tile for twelve years, that he had known Mr. Gonyaw since childhood, and that he had worked with Mr. Gonyaw for seven years. Mr. Tchouros said that on February 6, 2015, he and Mr. Gonyaw went to the last stop of the day. He identified photographs of the home. Mr. Tchouros recalled that he stood in the hallway, assisting as Mr. Gonyaw cleaned the master bedroom carpet. Mr. Tchouros said that he noticed something to his left, that he turned left, and that the Defendant stood about one foot away pointing a gun toward Mr. Tchouros's head. Mr. Tchouros said that he yelled, "Oh, s---," and that Mr. Gonyaw turned around in the doorway of the bedroom, saw the Defendant, and ran further into the bedroom. Mr. Tchouros said he ran into a bedroom across from the master bedroom. Mr. Tchouros thought he was going to die.

Mr. Tchouros testified that before he ran into the bedroom, the Defendant told him to "get on the ground." Mr. Tchouros said that he "drew his gun" from his side holster, that he walked toward the bedroom door, and that he saw the Defendant running behind Mr. Gonyaw with the gun pointed at Mr. Gonyaw's head. Mr. Tchouros thought the Defendant was going to kill Mr. Gonyaw. Mr. Tchouros said that intended to protect himself and Mr. Gonyaw with his nine-millimeter handgun but that he did not fire because he feared unintentionally shooting Mr. Gonyaw. Mr. Tchouros said that when he began firing his handgun, Mr. Gonyaw jumped into the master bathroom. Mr. Tchouros said that the magazine held sixteen bullets and that he fired until the handgun was out of ammunition.

Mr. Tchouros testified that he "took cover" inside the bedroom when the Defendant returned fire and that he and the Defendant fired back and forth before Mr. Tchouros ran out of ammunition. Mr. Tchouros said that he asked the Defendant to "drop" the firearm, that he "slid the gun closed" to make the Defendant think he had reloaded the handgun, and that he ran, stood over, and pointed the handgun at the Defendant. Mr. Tchouros said that he and the Defendant pointed their respective handguns at each other and that, eventually, the Defendant put down his gun. Mr. Tchouros said that, afterward, Mr. Gonyaw came out of the bathroom, kicked the Defendant's gun away, and demanded to know if anyone was with the Defendant. Mr. Tchouros recalled that Mr. Gonyaw ran outside and called 9-1-1.

Mr. Tchouros testified that he picked up the Defendant's handgun and pointed it at the Defendant, that the Defendant began to crawl out of the house, and that he followed the Defendant to the front yard of the home. Mr. Tchouros was unsure if the Defendant had a weapon in his hand but said he saw something in the Defendant's hand. Mr.

Tchouros said that he told the Defendant not to move but that the Defendant told him "to go get [the Defendant's] brother." Mr. Tchouros said that the home's front door remained open the entire time he and Mr. Gonyaw were at the home because of the hoses coming from the work van into the home.

Mr. Tchouros identified photographs of blood on the floor and stated that it had not been there when they arrived. He identified a photograph of the bedroom in which he took cover and stated that the photograph showed bullet holes in the wall. He said that the bullet holes were created by the shots being fired at him. He identified a photograph of the master bedroom in which he found the Defendant on the floor just inside the doorway after the shooting ended. Mr. Tchouros said that the Defendant wore a "hoodie" and a toboggan with snowflakes. Mr. Tchouros denied that the Defendant demanded and took property or money.

On cross-examination, Mr. Tchouros testified that the Defendant did not leave the master bedroom when Mr. Tchouros fired his handgun at the Defendant. Mr. Tchouros said that the bedroom did not have an exterior door and agreed that the Defendant was shot during the exchange of gunfire. On redirect examination, Mr. Tchouros stated that the Defendant did not drop the handgun initially and that Mr. Tchouros yelled at the Defendant three or four times to drop the handgun.

Mr. Gonyaw testified that on the day of the shooting, he began cleaning the master bedroom carpet and that Mr. Tchouros began pulling the hose out of the bedroom as Mr. Gonyaw cleaned his way out of the room. Mr. Gonyaw stated that he heard Mr. Tchouros say, "Oh, s---," that he dropped the equipment, and that he walked toward the hallway. Mr. Gonyaw said that the Defendant was one or two feet away from him and Mr. Tchouros and was pointing a gun at them. Mr. Gonyaw said that the Defendant's arm was extended fully as he pointed the gun at them and told them to "get on the ground." Mr. Gonyaw said that he ran into the master bedroom and that Mr. Tchouros ran into the bedroom across the hallway. Mr. Gonyaw said that he was scared, that he thought he "could possibly die," that he thought about what to do, and that he decided to go into the adjoining bathroom. He said that he waited and that he heard gunshots. He said that although he knew Mr. Tchouros carried a handgun, he did not know who was firing the shots. Mr. Gonyaw said that when the shooting stopped, he looked out from the bathroom, that he saw Mr. Tchouros, who yelled multiple times for the Defendant to drop the handgun, and that the Defendant ultimately dropped his handgun. Mr. Gonyaw said that he kicked the Defendant's handgun, that he asked the Defendant if anyone else were at the home, that the Defendant denied anyone else was there, and that Mr. Gonyaw left to call the police.

Mr. Gonyaw testified that the Defendant mentioned having children and a brother. Mr. Gonyaw said that he returned to the master bedroom, that the Defendant began to crawl toward Mr. Tchouros, that the Defendant had a knife in his hand, and that the Defendant crawled to the front yard. Mr. Gonyaw denied having and shooting a handgun that day.

On cross-examination, Mr. Gonyaw testified that he was not injured during the shooting. He said he was unable to close the bedroom door during the shooting because of the hoses. He thought he heard about twenty shots and said the Defendant was shot during the exchange. Mr. Gonyaw did not know the size of the knife in the Defendant's hand and said it looked as though the Defendant struggled to crawl. Mr. Gonyaw agreed that he did not know the Defendant, that he had never seen the Defendant before the shooting, and that he and the Defendant did not "have any problems." Mr. Gonyaw stated that the Defendant did not demand money or property and that the Defendant did not take anything from him.

Memphis Police Officer Seth Joneas testified that he responded to the scene, that he saw Mr. Gonyaw and Mr. Tchouros standing in the front yard with their hands up, and that the Defendant lay on the ground screaming. Officer Joneas said that Mr. Gonyaw and Mr. Tchouros pointed toward two handguns and told Officer Joneas what had occurred. Officer Joneas said that the inside of the home was consistent with the victims' statements, that he found cartridge casings in two bedrooms, and that he saw small drops of blood in the hallway.

Memphis Police Sergeant Ma'Hakk Abdul-Baaqee testified that he responded to the scene and that he saw Mr. Gonyaw and Mr. Tchouros standing in the front yard with their hands up. Sergeant Abdul-Baaqee said that Mr. Gonyaw and Mr. Tchouros pointed toward the Defendant and that the victims reported the Defendant had attempted to rob them. Sergeant Abdul-Baaqee said that the Defendant was "very combative" and had suffered multiple gunshot wounds, that the Defendant had a knife, and that Sergeant Abdul-Baaqee's focus was on the Defendant while other officers spoke to the victims. Sergeant Abdul-Baaqee said that the Defendant's combativeness made it difficult to place the Defendant on a stretcher and for the paramedics to assess the Defendant's condition and that the Defendant was ultimately restrained in order to allow for medical treatment. Sergeant Abdul-Baaqee said that he rode in the ambulance to the hospital and that the Defendant remained combative when the hospital staff provided medical treatment.

On cross-examination, Sergeant Abdul-Baaqee testified that the Defendant was angry and sustained gunshot wounds to the lower extremities and groin area. Sergeant Abdul-Baaqee said the knife was on the ground within arms' reach of the Defendant. Sergeant Abdul-Baaqee said that the Defendant underwent surgery, that the Defendant was sedated after the surgery, and that he remained with the Defendant until 11:30 p.m.

Memphis Police Detective Jamal Saulsberry testified that he responded to the scene, that the victims had been placed in separate police cars, and that the Defendant was on the way to the hospital. Detective Saulsberry said that after he looked inside the home, he returned to the police station with the victims, who provided statements. Detective Saulsberry said Mr. Tchouros had a permit to carry a handgun. Detective Saulsberry stated that Mr. Tchouros's handgun had an extended magazine and that the Defendant's handgun did not.

Memphis Police Crime Scene Officer Christopher Slaughter testified that he processed the scene and that he saw a blood trail going through the living room and the hallway and multiple bullet strikes and cartridge casings in two bedrooms. He recovered two handguns, a black and white hat, and a red box cutter. Photographs of the evidence, which were received as exhibits, were consistent with Officer Slaughter's description of the scene.

Officer Slaughter testified that the location of the cartridge casings supported a conclusion that one shooter stood in the doorway of a bedroom or in the hallway and that another shooter stood in the doorway of the other bedroom located straight across the hallway. He said that twenty-four nine-millimeter cartridge casings and two bullets were recovered, that both firearms were nine-millimeter handguns, and that, as a result, all of the cartridge casings and bullets recovered were nine-millimeter.

On cross-examination, Officer Slaughter testified that it was possible the handgun containing the extended magazine was fired more times than the other handgun. He agreed that the Defendant's handgun contained four live rounds, including one in the chamber. He said he recovered multiple cartridge casings and one fired bullet from the master bedroom floor. He said he that from the other bedroom he recovered multiple cartridge casings and one fired bullet from the wall. He said no physical evidence, including cartridge casings, was recovered from the master bathroom. He agreed blood was found on the master bedroom floor.

Upon this evidence, the jury found the Defendant guilty of attempted second degree murder, employing a firearm during the commission of a dangerous felony, reckless endangerment, and two counts of aggravated assault. At the sentencing hearing, the trial court sentenced the Defendant to an effective twenty-nine-year sentence. This appeal followed.

## I.     Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions for attempt to commit second degree murder, employing a firearm during the commission of a dangerous felony, and the aggravated assault against Mr. Gonyaw. He does not

challenge his remaining convictions. The State responds that the evidence is sufficient to support the convictions. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

## A. Attempt to Commit Second Degree Murder

A defendant commits criminal attempt when he acts "with the kind of culpability otherwise required for the offense . . . [and] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2). Second degree murder is defined as a knowing killing of another. *Id.* § 39-13-210(a)(1); *see id.* § 39-11-106(a)(20) (2018). Second degree murder is a result-of-conduct offense. *State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). Therefore, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b) (2018). "[T]he 'nature of the conduct' that causes death is inconsequential." *Page*, 81 S.W.3d at 787. Intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93.

The evidence reflects in the light most favorable to the State that the Defendant entered the home and pointed a handgun at Mr. Tchouros and Mr. Gonyaw and demanded they get on the floor. Instead, the victims fled to different bedrooms, and the Defendant chased Mr. Gonyaw while pointing a handgun at Mr. Gonyaw's head. Mr. Tchouros, who believed he was going to die, retrieved his handgun and shot at the Defendant, who returned fire. Multiple cartridge casings were recovered from the

bedroom from which the Defendant shot at Mr. Tchouros, and a fired bullet was recovered in the bedroom from which Mr. Tchouros fired his handgun, along with multiple bullet strikes on the walls. The evidence supports a determination that the Defendant acted with awareness that his conduct was reasonably certain to cause Mr. Tchouros's death, although he was uninjured. The evidence is sufficient to support the Defendant's attempted second degree murder conviction. He is not entitled to relief on this basis.

To the extent that the Defendant asserts his shooting at Mr. Tchouros was in self-defense, this defense is only available to "a person who is not engaged in unlawful activity and is in a place where the person is entitled to be[.]" T.C.A. § 39-11-611(b)(2) (2018). The Defendant was not present lawfully in the home where the shooting occurred. The Defendant was not engaged in self-defense, and he is not entitled to relief.

## B.  Employing a Firearm During the Commission of a Dangerous Felony

"It is an offense to employ a firearm during . . . [t]he commission of a dangerous felony. *Id*. § 39-17-1324(b)(1). Attempt to commit second degree murder is a dangerous felony. *See id*. § 39-17-1324(i)(1)(B).

Because the evidence is sufficient to support the Defendant's attempted second degree murder conviction and because the evidence shows he used a firearm to commit the offense, the evidence is likewise sufficient to support his employing a firearm during the commission of a dangerous felony conviction. *See id*. § 39-17-1324(i)(1)(B). The Defendant is not entitled to relief on this basis.

## C.  Aggravated Assault Against Mr. Gonyaw

Assault is defined, in relevant part, as "[i]ntentionally or knowingly caus[ing] another to reasonably fear imminent bodily injury[.]" *Id*. § 39-13-101(a)(2). A defendant commits aggravated assault when he "[i]ntentionally or knowingly commits an assault . . . and the assault . . .[i]nvolved the use or display of a deadly weapon[.]" *Id.* § 39-13-102(a)(1)(iii).

Mr. Gonyaw testified that he heard Mr. Tchouros say, "Oh, s---," and that he saw the Defendant standing one or two feet away from him and Mr. Tchouros and that the Defendant's gun was pointed at him and Mr. Tchouros. Mr. Gonyaw said that the Defendant's arm was extended fully when the Defendant pointed the gun at them and told them to "get on the ground." However, Mr. Gonyaw ran into the master bedroom, and Mr. Tchouros ran into the bedroom across the hallway. Mr. Gonyaw was scared and thought he could die, hid in the adjoining bathroom, and heard gunshots. This evidence

is sufficient to support the Defendant's conviction for the aggravated assault against Mr. Gonyaw. The Defendant is not entitled to relief on this basis.

## II.    Limiting Cross-Examination

The Defendant contends that the trial court erred by limiting his cross-examination of Detective Saulsberry about the affidavit of complaint. He argues that he was attempting to refresh the detective's recollection with the affidavit to show that the police responded to a robbery call, not an attempted murder and aggravated assault call. The State contends that the trial court did not abuse its discretion by limiting the evidence. We agree with the State.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006). Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

"The Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense which includes the right to present witnesses favorable to the defense." *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000); *see Washington v. Texas*, 388 U.S. 14, 119 (1967). Likewise, due process protects a criminal defendant's right to confront and cross-examine witnesses. *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *see Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). "[A] denial of the right to an effective cross-examination is 'constitutional error of the first magnitude and amounts to a violation of the basic right to a fair trial.'" *Dishman*, 915 S.W.2d at 463 (quoting *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980)). "The propriety, scope, manner, and control of cross-examination of witnesses, however, remain within the discretion of the trial court." *State v. Echols*, 382 S.W.3d 266, 285 (Tenn. 2012). In that regard, a court may limit cross-examination due

to such factors as "harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. 1994).

On cross-examination, trial counsel asked Detective Saulsberry if he recalled how "the [police] call went out" regarding the incident. He did not recall, and counsel asked if he prepared the affidavit of complaint. Detective Saulsberry stated that he had prepared the affidavit of complaint with complete and accurate details before taking it to a magistrate.

The prosecutor objected on the basis of relevance, arguing that the charging document did not "have any relevance to the proof in the case" and that the document could not be introduced. Trial counsel stated that she was attempting to refresh the detective's recollection about the nature of the police call and that she was laying the foundation for the affidavit of complaint to be used to refresh the detective's recollection. Counsel told the trial judge that the police call was for a robbery and was relevant to showing "what was going on when [the detective] arrived at the scene." The trial court determined that whether the police were responding to what the caller believed was a robbery was irrelevant. The court found that counsel was attempting to present an unknown person's opinion, which was irrelevant to whether the Defendant committed a particular offense.

We conclude that the trial court did not abuse its discretion by limiting the cross-examination of Detective Saulsberry in this regard. Evidence that the victims and the responding police officers believed the incident involved a robbery had no bearing on whether the Defendant had committed the charged offenses. The Defendant is not entitled to relief on this basis.

### III.  Admission of Evidence Related to the Defendant's Combative Demeanor

The Defendant contends that the trial court erred by permitting Sergeant Abdul-Baaqee to testify about the Defendant's combative demeanor at the scene and inside the ambulance. The Defendant argues this evidence was irrelevant and prejudicial. The State responds that the court did not abuse its discretion by admitting the evidence. We agree with the State.

Sergeant Abdul-Baaqee testified that the Defendant had been shot multiple times but was alert and combative when Sergeant Abdul-Baaqee arrived at the scene. Sergeant Abdul-Baaqee said that his focus at the scene was on the Defendant and explained that

> when the paramedics and ambulance arrived we were trying to get him
> from the ground to the stretcher. The gentleman was still being combative

at the time. Even when we got the gentleman into the ambulance, he was being combative as the paramedics were trying to assess him . . . .

Going from the scene to the hospital it became so chaotic inside the ambulance that they had to restrain him in order to actually properly treat him before he got to the hospital.

As Sergeant Abdul-Baaqee began to discuss the ambulance's arrival at the hospital, trial counsel objected, stating that Sergeant Abdul-Baaqee had already mentioned the Defendant's combative demeanor and that "any additional discussion of his demeanor and his resistance of treatment is . . . not relevant and prejudicial."

The trial court found that Sergeant Abdul-Baaqee was providing a history or sequence of events from the crime scene to the hospital and that Sergeant Abdul-Baaqee was not "repeating himself." The court continued that if Sergeant Abdul-Baaqee "goes back and start[s] talking about it again, then I'll --." Counsel interrupted and stated that her objection was to any discussion about the Defendant's "resistance or combative demeanor" because it was irrelevant and was prejudicial. The court determined that the evidence was relevant because the Defendant was charged with attempting to kill another person and that the State had the right to show that the Defendant was in a "bad mood." The trial judge stated that he understood a bad mood after having been shot multiple times. The court likewise determined that the evidence was not unfairly prejudicial, as long as Sergeant Abdul-Baaqee did not repeat himself. The record reflects that the only additional evidence of the Defendant's demeanor was that Sergeant Abdul-Baaqee testified the Defendant was "still being combative" when the ambulance arrived at the hospital.

We conclude that the trial court did not abuse its discretion by admitting evidence of the Defendant's demeanor after the shooting. The Defendant entered a home and pointed a gun at two people without provocation and engaged in a shootout, during which the Defendant was shot multiple times. The Defendant engaged in acts of violence, and his demeanor was relevant to determining his mental culpability and intent to commit the charged offenses. *See* Tenn. R. Evid. 401, 402. The evidence was relevant, and its probative value was not substantially outweighed by the danger of unfair prejudice. *See id*. 403. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE